on behalf of the people and his colleague Pete Price. Good morning, Mr. Cummings. This appeal deals really just with one solitary issue, and that is whether or not the Carpentersville Police were justified in frisking the defendant, Evan Fox, on July 9, 2001, after a voluntary stop. I think in this case I'd like to discuss a little bit the facts of the case before moving on to some of the case law. Well, I would suggest, counsel, as they're relevant to your argument, because we have read all of the facts, we're fully familiar with the facts, we've read all of the briefs, so that I would suggest maybe you want to spend your time on the legal argument and use the facts to support your argument. Very well. With regard to the cases that we think are relevant in this case, there's three cases in this area, Galvin, Flowers, and Rivera. Those cases, in terms of the commonality of those cases, those cases involve either a state argument or an officer's justification for the search that were either general in nature or routine in nature. In Galvin, the state made an argument that, or asked the court to allow a justification for a Terry search in all cases in which the police were investigating a burglary case. The U.S. Supreme Court said that that particular argument was not going to be allowed because of the fact that it's a general sort of thing, it's a class of people, and in order in this area we've got to have particularized and specific kinds of facts that would justify the search. That statement is true, however, the officer's subjective belief based upon his own experience is still a relevant factor when considering the totality of the circumstances, correct? That's correct. In other words, you don't just ignore Accomando's testimony that his experience is that burglar suspects are often armed. That's correct. That's a factor, it's just no legal presumption, correct? Yes, Your Honor. I mean, obviously, not obviously, but yes, the officer's subjective, his mindset is relevant and then you've got to make a decision whether or not, given his mindset, that that's objectively reasonable. Let me ask you this, but that, his own experience, the fact that he has that experience and the other officers didn't share that experience, is that experience imputed to them because they're the ones, Crow is the one that pats your client down, not Accomando, correct? Yes, that's correct. So that experience, even though Crow might not have had reasonable justification because he testified he didn't have any reason to believe they were armed or dangerous, but that experience that Accomando has, is that then imputed to Crow, who does the pat-down? I believe, based on my reading of the case law, that that would be imputed. In other words, all the information that the officer had, I would think, including experience, would be imputed to Crow. Just like probable cause determination. Sure, I think that's right. Are there any other factors that the police took into account here, time of day? Well, it was night, they mentioned that, but again, I think the other thing that they also indicated, or at least Accomando indicated, at least initially, that at trial, or not trial, but at the motion, that he was in some way outnumbered. And I think when you kind of look, outnumbered meaning there was one of him and two of the suspects. Before the pat-down, the cavalry arrived, right? That's correct. So I think just factually, that would not be correct, even though I don't exactly know whether he was saying that at the time of the frisk, he was outnumbered. He was outnumbered at the time of the stop, but when we look to the issue of being outnumbered, especially in regard to that Sorenson case. The Sorenson case was a case that distinguished the cases I'm citing, Galvin and Flowers. And a big part of that particular case in Sorenson, if you'll recall, was that the officer made a stop of a vehicle after having observed some activity that he believed involved a drug transaction. One of the major differences between Flowers and Galvin vis-à-vis Sorenson was the belief by the court that because there were three individuals in a vehicle, that that would have given greater justification for the search that was not present in Galvin and in Flowers. And I think that's we're closer in terms of facts, I think, to Galvin and Flowers in terms of we don't have a vehicle here. We have a situation where at all times these defendants or this defendant was cooperative, was compliant, did everything the officers asked of him to do. Their hands were visible at every particular point in time. So from your question regarding facts, really the facts, the three facts he gave when asked specifically were, I basically believe that all verbal suspects have a weapon. He operates with that sort of thought process going in. It was dark and he was outnumbered. How long was it before somebody else arrived? Within seconds. That's right, it was pretty short. Yeah, within seconds. In other words, he was actually directed to stop these individuals by an officer who was behind him because he was slightly closer. But the officer that was behind him arrived just momentarily. So by the time, I mean, the cavalry obviously, as Justice Burkett said. More officers arrived. I'm sorry? More officers arrived after the second one. Yes, even such that Accomando did not actually do the search, but Officer Crow did the search. What about the time of day and darkness? How is that relevant? Well, given the officer's mindset that he basically believes all burglary suspects are armed, in my view, it didn't really matter to him, even though he did say it. But it seems to me if you believe all burglary suspects are armed, it wouldn't matter if there's 100 officers there. It wouldn't matter if it was broad daylight at noon. If you have that subjective belief, it seems to me that you would actually probably be wise, if you had that belief, to pat somebody down. Your theory is that a Terry stop, there's separate justification for the Terry stop. You don't contest that. No, I don't. But just with the general principle that a Terry stop must be conducted expeditiously as soon as practical under the circumstances, that also applies to any justification for a frisk, correct? In other words, if there's no longer any justification for a frisk, then you don't go forward with it. Right, and I think in this particular case, when the frisk actually occurred, when it occurred, you have to look at what positions these individuals were in. And basically, he had asked these individuals to go into his car, which they did, to sort of get spread out and put their hands on the, I'm sorry that I keep hitting this thing, put their hands on the trunk. So he's got them in a position, in our view, where they're secure. They can be questioned at that particular time. He's armed. The other officers are arriving. And moments later, it's my view at that point in time, there's no objective basis for him at that point to frisk this particular individual. Were they fleeing at any point? Were they before he apprehended them? Not in the sense of what they observed. What they observed was, and it was another thing I wanted to mention that you have to kind of read through here. These particular individuals, when they were walking, so they're seen walking. They're not seen walking in any abnormal way, fast, or anything like that. And they are in a residential area. I mean, Officer Blaney testified when he was asked by trial counsel, when you first observe these individuals, where were they? Were there lights? Yes, there were lights. Were there houses? Yes, there were houses. Is this a residential area? He says it is a residential area. Now, obviously, the business is only about a block and a half from where they were stopped. So it's not clear for the record, but it appears to be kind of a mixed-use kind of area. But my point is, if you look at some of these other cases, especially like McGowan, which is cited in the state's brief, you have individuals that are located in a commercial and industrial area where there's no pedestrian traffic, where you otherwise would not find people normally doing non-criminal type things. Here, you know, it's July night. It's a summer night. It's Saturday morning. There's a lot of possible things, other than violating the law, that an individual could be doing in a residential area, especially a young kid at that particular time. So, no, the answer to the question is that they were not fleeing. They were walking. There was a dispatch. There was a dispatch that the individuals were fleeing. I don't know. Obviously, we don't know what that means. Were they running? There's nothing like that. Right, but if they were fleeing, that still doesn't mean they were armed, does it? No. No, that could be a factor. Does it matter that they didn't ask any questions? Well, the law says they're not required to ask questions before frisking. You know, it's a frisk. But I think it sort of goes to what's going on there. And I think what's going on there is he has this subjective belief, and based on that belief, again, I understand why he's doing what he's doing. He's not going to take any chances. The question is whether that's a constitutional sort of practice. We don't think it is. You just mentioned the call. Was the call of two males or was it one male? I think it was Blanick's testimony. His memory was refreshed. He read the report, and then he testified that the report was of a tall male wearing dark clothing. So was it the call of one person or was it two? Well, there was some difference in the testimony. Accadamato said two males. Accadamato wrote the report. The report said a tall male wearing dark clothing. That's what Blanick's testimony was. So arguably what they observed didn't even match the report of a tall male wearing dark clothing. That's true. That's true. So what about the State's alternative argument that even if there was no justification for the pat-down, the items that were recovered from your client's pockets weren't plain due when they were recovered? Well, again, I think if you look through the testimony, the trial counsel pointed out when he questioned Crow, basically, was the only way that you were able to observe what it was that you observed was in connection with the frisk. And he kind of identified what he did with the frisk. And there was no evidence presented in the case that but for the frisk these things were observable. So my argument there would be the State obviously took advantage of the frisk to obtain the items. I don't think anything was immediately apparent until, and as I, as you. Well, except they were falling out of his pocket, weren't they? I mean, I don't know. I can't remember the exact number of jars or bottles of the substance. And I think the record showed that they were just flowing out of his. Well, I don't think they actually fell out of his pocket. No, they didn't fall. But, I mean, they were. Well, he was situated in the way that he was situated by the, in other words, he was maneuvered by the police into a particular position, right? I mean, in terms of putting your hands on the hood, bending down. And then in connection with the search, he's able at that point in time, based on how the defendant is positioned, to see the items. So to me, I mean, my argument would be. So if he wasn't, weren't in that position, you're saying? Right. He wouldn't have been visible? I don't think so. His shirt would have covered it up. Crow's testimony was his shirt. His shirt, it became visible because of the position he was in for the frisk. Right. That's correct. Then the trial court made no alternative finding that they established it by. No. The finding was fairly limited in terms of the findings of fact and law regarding what the court found or didn't find. I mean, it just said, basically, defendant's motion is denied. And the court dealt with the issue and said, I think the frisk was reasonable. That's essentially what he said, not really getting into the plain view issue at all. Again, I'll just finish up with the idea that in this particular case, our view is that this was more of a generalized sort of a search. In other words, I think if you look at the logical conclusion of O'Connell in terms of his thought process would be he would, I think, logically, frisk every burglary suspect that he came into contact with, given what his subjective belief is. And I think that sort of practice where you don't get into the specific and particularized reasons why you're doing something and just searching a class of people like in Rivera, for instance, that was a case where the police had a subjective belief that all drug suspects or narcotic suspects are likely to carry guns. And that was one of the reasons why in Rivera the police conducted a Terry frisk at that particular time. So in Flowers, the officer basically said, I do this in every case where I stop anybody. So when you get involved in this sort of general classes of people or sort of this idea of routine, the courts have basically said that's inappropriate. It shouldn't be done. It's got to be particular and specific. So if you don't have any other questions at this time. No, I don't believe we do, but you'll have time on rebuttal. Thank you very much. Ms. Price. Good morning. Good morning. May it please the Court, Counsel, I'm Colleen Price for the people of the State of Illinois. There are a number of things that I would like to address. First, I'll go through a list. Counsel seems to say that all Officer Accomando relied on in making this judgment call that a frisk was necessary was that it was dark, he was outnumbered, and he had a generalized belief that burglary suspects carry weapons. It was much more than that. Testified to more than that? Yes. The testimony of all of the officers, including Accomando, the totality of the circumstances indicate that this was more than just these three factors. Well, the other officers testified that they had no reason to believe these suspects were armed or dangerous. Blahnik and Crow both were asked that directly, and they said no. Well, here's what I mean by the totality of the circumstances. And you said the other officers' testimony. Their testimony was that they had no reason to believe these suspects were armed or dangerous. Only Blahnik, I believe, said that. Blahnik and Crow. But when he was cross-examined, he did say they asked him, well, could it be possible that a burglary suspect could be armed? And he did say yes. So he acknowledged that. Isn't the issue whether these two were potentially armed and dangerous? Pardon? I'm sorry? Isn't the point whether these two individuals, not any burglary suspect? Yes, but the experience of the officers is relevant. This officer, Accomando, had 13 years of experience in the Carpentersville community, and so that's very relevant. What we have here is the cases that defendant cites are inopposite. Galvin, there was no belief. None of the officers testified. None of them testified that they thought that the suspects were armed. Flowers, a burglary had not taken place, so there was no crime. And in Rivera, it was only the generalized theory that drug dealers carry weapons, but they did not believe that that suspect was a drug dealer. So here we have a crime that was committed, specifically a burglary. Which justifies a stop. Which justifies a stop. They're separate questions. Yes, I understand. In your brief and in this argument, don't conflate the issues. One, when the pat-down takes place, there's at least three and probably four officers there on the scene. What justified the frisk under those circumstances? Well, it's relevant that a burglary occurred because Officer Accomando is the officer who arrived first. In the record site, page 88, he said that he was alone at first, which is supported by record site 3748, where Blahnik stated that when he came on the scene, Officer Accomando was already frisking. So if he's already frisking, then that means he had time to stop the car, run, sprint up to them, tell them to stop, put their hands on the hood of the car. So there was time. It wasn't mere seconds. The testimony was that it was less than a minute, and that means it's mere seconds. That was Blahnik's testimony. That was Crow's testimony. He was still alone. Just because backup was inbound, really, we're talking about officer safety here. He wasn't alone when the pat-down occurred because Crow is the one who conducted the pat-down, and by that time, Blahnik was also on the scene. But Crow testified that when he came on the scene, Accomando had already commenced, asked him to pat down the defendant because he was the one, Accomando was the one frisking the companions, Mr. Collins, I believe, because he was the one that looked a little flighty because he looked both ways, and his 13 years of experience on the Carpenters Police Force, he felt like he was going to flee. In the dispatch, was there any information about a broken window? Yes. And how is that relevant or not? That is relevant because they knew that the glass had been broken, but they didn't know with what implement had been used, so that is relevant. And Officer Accomando was aware of this either by his personal experience, I think he might have testified to that, or imputed among the various officers. That is Record Site 21 and 84. So they knew the damage had been done to the building, but they didn't know at that time with what. So we have the fact that he felt he had... Well, they did know that no one had reported a gunshot. Yes. And it's just as likely a brick went through the window, isn't that correct? And isn't that exactly what was found inside? I believe that was what was found, but that wasn't found until later. Right, but there was no report of a gunshot or any other... No, there was no report of a gunshot, but weapons can be anything. They could have had the brick on them, it could have been the butt of a gun, it could have been... It's just armed and dangerous and a threat, a potential threat to the officer's safety and those around him. So the late nights, no one else was around, the businesses were closed, it was a residential area, which also heightens the security. If the weapon used is the butt of a gun, we don't want bullets flying around. It was dark, and that affects the officer's visual assessment. Here, in his experience, he stated, I believe that in my experience, not just I just think that burglary suspects carry weapons. Why not? Would you agree that Terry Stott's stop-and-frisk situations are to be conducted expeditiously and to allow citizens, once you've satisfied your concerns, to allow them to leave as soon as possible? Would you agree with that general principle? Generally, it's supposed to be reasonable with respect for their Fourth Amendment rights. And here, your argument is that because he was alone, that's one of the primary factors that justified the frisk, correct? Yes, because there were two suspects. Again, he's no longer alone when the frisk occurs. But really, just because he's no longer alone, how does that make him safer? This isn't like Galvin, where the five officers had guns drawn. These suspects could have very well acted up or done something, just because counsel made the argument that they had their hands on the hood, but they could have made a movement. In fact, there is no requirement that the police officers question. Sometimes it's preferred, but here I think it is a testament. Well, they did question. They did ask both if they were armed, and they both reported that they were not. Right before, while Officer Accomando was frisking Mr. Collins, Officer Crow did ask the defendant, do you have any items that would poke me, whatnot, are you armed? So he did during that time. But again, they could be lying and whatnot. So would all of the officers then be at risk? Pardon? Would all of the officers then be at risk? They could very well be at risk, because the outnumbered is, I would venture to say, a part of the totality of the circumstances, but it by no means necessarily makes the situation much safer. And it's a testament to Officer Accomando when he, I think it shows his fear for his safety, that the first thing he did was sprint up to them, because they didn't stop when he had pulled over the flashing lights. The police officers, he had to sprint up to them and tell them to stop. He testified that they did stop when he told them to stop. They did stop, but he still had to sprint up to them and tell them to stop. Yeah, but he didn't have to sprint after them. They stopped when he said stop. He testified that he had to sprint. He testified that he sprinted up to them, but they stopped when he said stop. Okay. But they could still attack him. So I think that the swift manner, which, as you said, if these types of stops should be conducted in an expeditious manner so that way they can be released, the fact that he did feel that he needed to frisk them first before conducting an interview, well, why are you out here at 1 a.m.? He never asked that. No, he didn't, but he frisked first before even conducting these questions. I think it is a testament that he felt it was necessary to protect his safety, the safety of the community around him, his other officers, even the safety of the defendants, protecting them from themselves if they were to act rash. Because it only takes seconds to shoot a bullet, and, Your Honors, if the... What about the report that Accomando apparently wrote, the report that listed a male, a tall male wearing dark clothing as opposed to two males? And the testimony was convenient, two males, because that's what there is, but the report that he wrote said a male wearing dark clothing. It doesn't strike a bell, Your Honor, but findings of fact are a manifest weight, and the report was not part of the evidence, and I guess the judge felt that he believed the two-person dispatch. But even if the numbers are off, the dark clothing, they were only a block and a half away. It was 1 a.m. And they all testified that there were no other people walking around, even though it was a residential area. Well, that all goes to the stop, and the stop is not contested. It goes to the stop, and it goes to the surrounding circumstances about why, where did this subjective belief come from, why Officer Accomando felt that he needed to disperse these subjects. I think that that is relevant. I know I realize that the stop is separate, but the reason for the stop is a part of the circumstances which give rise to that officer's feeling that he is in danger. And the Supreme Court said we will accept no presumption that a burglary suspect is always armed. Yes, and we're not asking for a per se rule. Right here, we're asking that under these circumstances where a crime had been committed, specifically a burglary in this officer's experience of 13 years in this area, his experience with burglary suspects are that they're usually armed. Where officers at the scene of the crime testified that windows had been broken and at that time they didn't know with what implements. With Galvin... There was no glass on either one of the suspects, correct? No. Again, they were a block away. They didn't do that type of assessment. It was dark. Officer Crow testified that when he was doing the pat-down of defendant, the lights from the police car were insufficient and he actually had to use his flashlight to shine. So that darkness is relevant to the totality of the circumstances and why this officer who made the judgment call to take control of the situation and secure the subjects. Do you agree with defense counsel that the plain view exception is not applied? If the frisk is bad, then... If the frisk is bad, then the plain view is not justified because he was in a position only because of the frisk. Your Honor, the people won't concede to that because we believe that there is an argument for plain view. Crow testified that it was only because he was bent over... That he saw the bodice. ...that he was able to see what was in the pocket. Correct? Yes. Are there any other questions, Your Honors? I don't think so. So in conclusion, Your Honors, we ask that you affirm the trial court's finding of the denial of the motion to suppress. Here we have a case. Please put yourself in the shoes of these officers that if you were confronted with the same situation where you had these two suspects and you had a good idea that they were burglary suspects, where it was dark, where you were initially the only one, even with backup inbound, you have no idea what type of behavior these suspects might exhibit that a frisk in this case was reasonable. Thank you. Thank you. Mr. Cummings? The thing is, at the time of the frisk, the officers were present, if that's not clear. He did have, by the way, your client did have dark clothing on, but he was wearing shorts, correct? Yes. Well, but what relevance, you said, that the other officers were there. But again, if the defendant had a weapon, everybody would have been in danger. It doesn't matter if there were three or four or how many officers were there. Except our courts have found that that is a legitimate concern for the officer. If the officer is, in fact, at the time of the frisk, outnumbered, that may give him greater leeway, in Sorensen at least, to conduct the search. And clearly the state, in their brief, talked about that quite a bit, and the officer testified to it. But Officer Acatamano, in the record, when he was asked by the state's attorney, not the defense lawyer, the state's attorney, so it was after you encountered them on the street, but before they were patted down that some other officers arrived as backup. Would that be fair to say, yes, sir? So other officers were present at the time the frisk occurred. The second thing is, and this is on Justice Burkett's question, Officer Acatamano's report, per se, is not in evidence, but Officer Crowe, in the record, refreshed his recollection with Officer Acatamano's report and basically said that the dispatch was a male wearing dark clothing. So if that was not clear, that's clear in the record that that was what the dispatch was, at least in terms of what the report said. So if I don't have anything else, if you don't have any other questions, then I'd ask the court. Thank you very much. Thank you, counsel. At this time, the court will take the matter under advisement and render a decision in due course. Court is adjourned for today. Thank you.